**Robert Perry DEHART Appellant**

v.

**Martin HORN, Commissioner of Corrections; James S. Price, Superintendent of SCI Greene; United States of America**

No. 99–3072.

United States Court of Appeals, Third Circuit.

Argued: July 27, 1999.

Reargued En Banc May 24, 2000.

Filed: Sept. 8, 2000.

48

Edward A. Olds (Argued), Pittsburgh, PA, for Appellant.

J. Bart DeLone (Argued), Office of Attorney General of Pennsylvania, Harrisburg, PA, Rodney M. Torbic, Office of Attorney General of Pennsylvania, Pittsburgh, PA, for Appellees.

Before: SCIRICA and STAPLETON, Circuit Judges, and GREEN,* District Judge.

Before: BECKER, Chief Judge, SLOVITER, MANSMANN, GREENBERG, SCIRICA, NYGAARD, ALITO, ROTH, McKEE, RENDELL, BARRY, FUENTES, and STAPLETON, Circuit Judges.

**OPINION OF THE COURT**

STAPLETON, Circuit Judge.

Plaintiff–Appellant, Robert P. DeHart ("DeHart"), an inmate at the Pennsylvania State Correctional Institution ("SCI") at Greene, commenced this civil rights action against Martin Horn, Commissioner of the Department of Corrections of Pennsylvania, and James Price, Superintendent of SCI at Greene (collectively "the prison" or "prison officials"), as a result of their failure to provide him with a diet consistent with his Buddhist religious beliefs. DeHart appeals the final order of the District Court, granting the defendants' motion for summary judgment. He insists that the

* Honorable Clifford Scott Green, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

defendants' failure to accommodate his religious belief, which requires him to follow a vegetarian diet, violates both his right to free religious expression under the First Amendment and his right to equal protection of the law under the Fourteenth Amendment. We will reverse the judgment of the District Court and remand the case for further proceedings consistent with this opinion.

### I.

DeHart is currently serving a life sentence at SCI at Greene. With the assistance of the City of 10,000 Buddhas, a center of Buddhist teaching, he has taught himself Buddhism during his incarceration. Based on his own reading of the Sutras, which are Buddhist religious texts, DeHart became a vegetarian. DeHart testified before the District Court that the First Precept in Buddhism prohibits the killing of any living thing, and he has interpreted that Precept as requiring that he follow a vegetarian diet. The prison officials do not challenge the sincerity of DeHart's beliefs and acknowledge that many Buddhists practice vegetarianism as part of the exercise of their religion. The prison officials do, however, challenge whether vegetarianism is mandated by any recognized Buddhist sect.

A brief overview of the inmate meal process at DeHart's institution is necessary to understand his request. Pursuant to a master menu, all inmates at SCI Greene receive the same meals. The food for those meals is obtained through bulk purchases. Those inmates whose health requires dietary modifications or restrictions receive a therapeutic diet. In order for an inmate to receive a therapeutic diet, however, it must be prescribed by an institution doctor. The therapeutic diet consists of the same foods (in different proportions) that are served on the master menu. The therapeutic meals are prepared individually, and all inmates who have been prescribed a therapeutic diet eat together in one dining hall after it has been cleared of other inmates.

DeHart proposes that he be served a vegetarian meal when other inmates are served therapeutic meals. DeHart secured the affidavit of a dietician, who averred that DeHart's nutritional needs could be satisfied by doubling the current portions of vegetables and grains and adding an eight-ounce cup of a soy-based milk product at each meal.[1] The cost of this supplement, which is not currently purchased by the Department of Corrections ("DOC"), would be $1.71 per day.[2]

---

1. As the affidavit of DeHart's dietician notes, his proposed diet does not meet the Recommended Daily Allowance ("RDA") standards for Vitamin D. riboflavin, B–6, and zinc as set forth by the National Academy of Sciences and adopted by the American Correctional Association. As she explains, it does provide more than two-thirds of the RDA standard in each instance, and these deficiencies did not cause her to qualify her opinion that the proposed diet was sufficient to meet DeHart's nutritional needs. The District Court made no findings regarding the significance, if any, of these deficiencies. The Pennsylvania DOC Food Services Administrative Directive requires that, for the master menu, a registered dietician verify that the diet "meets or exceeds the dietary allowances as stated in the [RDAs] ...." App. 652. For the therapeutic diets, however, the regulation merely requires that the diet "be designed and certified by a Registered Dietician as being nutritionally correct." App. 656. The regulation also provides that it "should be interpreted to have sufficient flexibility so as to be consistent with law ...." App. 657. On remand, the District Court may find it necessary to determine how this Administrative Directive should be interpreted in this context. If it should determine that the proposed diet is inconsistent with the Administrative Directive, however, the issue would remain whether under *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the prison rules and regulations as a whole, as applied to this case, are reasonably related to legitimate penological interests.

2. The dietician indicated that a day's supply of soy-based milk product would cost $1.71 if purchased in a supermarket and would cost less if purchased directly from a distributor.

On June 17, 1995, DeHart submitted a written grievance, requesting a diet that comports with his religious beliefs. That grievance was denied, and DeHart appealed the denial to Superintendent Price, who concurred in the result. The denial was again upheld on appeal by the DOC Central Office Review Committee. DeHart then filed this suit pursuant to 42 U.S.C. § 1983.

A preliminary injunction hearing was held before a Magistrate Judge, who found that vegetarianism is not mandated by Buddhism and, for that reason, recommended that DeHart be denied preliminary relief. The District Court adopted the Magistrate Judge's recommendation. DeHart then appealed to this Court, and we affirmed the denial of preliminary injunctive relief. *See Dehart v. Horn,* 127 F.3d 1094 (3d Cir.1997) (hereinafter "Memorandum Opinion"). In the Memorandum Opinion affirming the District Court's decision, this Court admonished the District Court not to interject itself into Buddhist doctrinal disputes: "We agree with [DeHart] that the district court could properly determine only whether he sincerely held his religious beliefs, not whether his beliefs are doctrinally correct or central to a particular school of Buddhist teaching." *Memorandum Opinion* at 2 (*citing Employment Division v. Smith,* 494 U.S. 872, 886–87, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)).

On remand, the parties engaged in additional discovery and filed cross-motions for summary judgment. The Magistrate Judge recommended that summary judgment be granted in favor of the prison officials. DeHart filed objections to the Magistrate Judge's Report and Recommendation, arguing, *inter alia,* that the Magistrate Judge ignored this Court's instructions and again based his opinion on a finding that vegetarianism is not mandated by the Buddhist religion. The District Court adopted the Report and Recommendation over that objection, and this appeal followed.

Following a decision of a panel reversing the judgment of the District Court, a majority of the active judges of this Court voted to rehear the appeal *en banc,* and the panel opinion was vacated.

## II.

We exercise plenary review over the District Court's decision to grant summary judgment. *See Wicker v. Consol. Rail Corp.,* 142 F.3d 690, 696 (3d Cir.1998). Summary judgment is appropriate only if there is no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law. *See id.;* Fed. R.Civ.P. 56(c). In our review, we must view all evidence and draw all inferences therefrom in the light most favorable to the nonmoving party. *See Wicker,* 142 F.3d at 696.

## III.

■ The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. CONST. amend. I. In *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), the Supreme Court held that the First Amendment was incorporated by the Fourteenth Amendment and, thus, applicable to the states. Although DeHart is incarcerated, the Supreme Court has made clear that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). "Inmates clearly retain protections afforded by the First Amendment, . . . including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (citations omitted). Nevertheless, the fact of incarceration and the valid penological objectives of deterrence of crime, rehabilitation of prisoners, and institutional security justify limitations on the exer-

cise of constitutional rights by inmates. *See Pell v. Procunier,* 417 U.S. 817, 822–23, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). Thus, a prison inmate "retains [only] those rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Id.* at 822, 94 S.Ct. 2800.

In *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Supreme Court articulated the standard for reviewing a prison regulation challenged on constitutional grounds: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." This test is intended to effect an accommodation between two well-established principles. "The first of these principles is that federal courts must take cognizance of the valid constitutional claims of prison inmates." *Id.* at 84, 107 S.Ct. 2254. The "second … is the recognition that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration' and [that] separation of powers concerns counsel a policy of judicial restraint." *Id.* at 84–85, 107 S.Ct. 2254 (*quoting Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974)). Thus, while this standard of review requires a court to respect the security, rehabilitation and administrative concerns underlying a prison regulation, without requiring proof that the regulation is the least restrictive means of addressing those concerns, it also requires a court to give weight, in assessing the overall reasonableness of regulations, to the inmate's interest in engaging in constitutionally protected activity.

*Turner* goes on to provide guidance on how to apply its reasonableness standard. As we recently explained in *Waterman v. Farmer,* 183 F.3d 208, 213 (3d Cir.1999) (internal citations omitted):

[*Turner*] directs courts to assess the overall reasonableness of such regulations by weighing four factors. "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it," and this connection must not be "so remote as to render the policy arbitrary or irrational." Second, a court must consider whether inmates retain alternative means of exercising the circumscribed right. Third, a court must take into account the costs that accommodating the right would impose on other inmates, guards, and prison resources generally. And fourth, a court must consider whether there are alternatives to the regulation that "fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests."

Of course, the *Turner* analysis is appropriate only in cases where a prison policy is impinging on inmates' constitutional rights. *Turner,* thus, assumes as a predicate that the plaintiff inmate has demonstrated that a constitutionally protected interest is at stake. In this case, DeHart asserts that his dietary requirements are derived from his Buddhist beliefs, thus implicating the First Amendment's guarantee of the free exercise of one's religion. The mere assertion of a religious belief does not automatically trigger First Amendment protections, however. To the contrary, only those beliefs which are both sincerely held and religious in nature are entitled to constitutional protection. As we explained in *Africa v. Pennsylvania:*

The relevant case law in the free exercise area suggests that two threshold requirements must be met before particular beliefs, alleged to be religious in nature, are accorded first amendment protection. A court's task is to decide whether the beliefs avowed are (1) sincerely held, and (2) religious in nature, in the claimant's scheme of things. *United States v. Seeger,* 380 U.S. 163, 185, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1965); *Callahan v. Woods,* 658 F.2d 679 (9th Cir.1981). If either of these two

requirements is not satisfied, the court need not reach the question, often quite difficult in the penological setting, whether a legitimate and reasonably exercised state interest outweighs the proffered first amendment claim.

662 F.2d 1025, 1029–30 (3d Cir.1981).

■■■ Thus, if a prisoner's request for a particular diet is *not* the result of sincerely held religious beliefs, the First Amendment imposes no obligation on the prison to honor that request, and there is no occasion to conduct the *Turner* inquiry. It is in this way that prisons are protected from random requests for special diets by inmates whose alleged dietary restrictions are not the result of their religious convictions but rather their secular predilections.[3] In this case, however, the defendants have stipulated for the purposes of their motions for summary judgment that the belief which occasions DeHart's request for a special diet is "(1) sincerely held, and (2) religious in nature, in [his] scheme of things." *Africa*, 662 F.2d at 1030. It, thus, follows that DeHart has a constitutionally protected interest upon which the prison administration may not unreasonably infringe. Accordingly, under *Turner*, we must inquire whether there is a rational connection between the prison's refusal to give DeHart his requested diet and a legitimate penological interest. If so, we must then determine whether the refusal is reasonable in light of the nature of the prison's penological interest, DeHart's interest in practicing his religion, the overall effect on the prison community of granting his request, and the availability of ways to accommodate DeHart's request at de minimis cost to valid penological interests. We will address those issues seriatim.

### 1. Rational Connection to Penological Interests

The prison asserts that two penological interests are served by denying DeHart's request for a vegetarian diet: (1) an interest in a simplified and efficient food service; and (2) an interest in avoiding possible resentment and jealousy on the part of other inmates. The District Court found that the denial of DeHart's religious diet was rationally related to those two legitimate, penological goals. Given the deference we must show to the reasoned judgment of prison officials, we agree.

In *Johnson v. Horn*, 150 F.3d 276 (3d Cir.1998), two Pennsylvania prison inmates sued prison officials, including Commissioner Horn, alleging a violation of their free exercise rights. The inmates were Jewish and were seeking a kosher diet in conformity with their religious beliefs. In that case, however, the prison officials conceded that the inmates were entitled to receive a kosher diet; the only issue was whether that diet had to consist of hot or cold meals. *See id.* at 281. This Court there specifically held that "[t]he Prison has a legitimate penological interest in keeping its food service system as simple as possible." *Id.* at 282; *see also Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir.1993) (same); *Kahey v. Jones*, 836 F.2d 948, 949–50 (5th Cir.1988) (same). We further observed that the inmates' "request for a

3. Prison officials are, of course, entitled both to make a judgment about the sincerity and religious nature of an inmate's belief when he or she asks for different treatment and to act in accordance with that judgment. If the request is not a constituent part of a larger pattern of religious observance on the part of the inmate, for example, the asserted religious basis for the request may be rejected as pretext. Moreover, while novel belief systems may be both sincerely held and religious in nature, their non-traditional character is relevant to both the "sincerely held" and "religious in nature" issues. As we recognized in *Africa*, in determining whether a particular, non-traditional belief or practice is religious in nature, "the courts have 'look[ed] to the familiar religions as models in order to ascertain, by comparison, whether the new set of ideas or beliefs is confronting the same concerns, or serving the same purposes, as unquestioned and accepted "religions." ' " *Africa*, 662 F.2d at 1032 (*quoting Malnak v. Yogi*, 592 F.2d 197, 207 (3d Cir.1979) (Adams, J., concurring)).

[religious diet] creates legitimate security concerns, including bringing additional foods from new sources into the Prison and the possible belief by other inmates that [plaintiffs] are receiving special treatment." *Johnson,* 150 F.3d at 282.

We think it clear that a prison's interest in an efficient food system and in avoiding inmate jealousy are legitimate penological concerns under *Turner.* Moreover, we agree that the prison's refusal to grant DeHart's request for a religious diet bears some rational relation to those concerns. The fifty-five therapeutic trays prepared at each meal complicates the food service regimen of the prison, and preparation of additional special meals would add incrementally to that burden. Similarly, while the evidence indicates that the provision of therapeutic meals has never given rise to problems in the past, it is not irrational to think that providing DeHart with a vegetarian diet to accommodate his religious beliefs might involve some risk of inmate jealousy.

█ This determination commences rather than concludes our inquiry. First, while a rational nexus between a regulation and a legitimate penological interest is essential to its validity, *see Turner,* 482 U.S. at 89–90, 107 S.Ct. 2254, not all prison regulations that are rationally related to such an interest pass *Turner*'s "overall reasonableness" standard. As the remaining factors evidence, the *Turner* standard also takes into account the extent of the burden imposed by the regulation on an inmate's religious expression, as well as the impact that accommodating the inmate's constitutional claim would have on the entire prison community and its resources.

2. Alternative Means of Religious Expression

This factor requires a court to focus on the burden that the regulation imposes on an inmate's ability to engage in constitutionally protected activity. *Turner* instructs that where " 'other avenues' remain available for the exercise of the asserted right, ·... courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials ... in gauging the validity of the regulation.' " *Turner,* 482 U.S. at 90, 107 S.Ct. 2254 (*quoting Pell v. Procunier,* 417 U.S. at 827, 94 S.Ct. 2800). Conversely, where the regulation leaves no alternative means · of exercising the asserted right, the inmate's interest in engaging in constitutionally protected activity is entitled to greater weight in the balancing process.

As the Supreme Court made clear in *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), and *Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989), when determining whether "alternative means of exercising the right" remain open, " 'the right' in question must be viewed sensibly and expansively." *Thornburgh,* 490 U.S. at 417, 109 S.Ct. 1874 (*quoting Turner,* 482 U.S. at 92, 107 S.Ct. 2254). *O'Lone* involved a constitutional challenge to policies adopted by New Jersey prison officials which resulted in the inmates' inability to attend Jumu'ah, a weekly Muslim congregational service. The Supreme Court explained that "Jumu'ah is commanded by the Koran and must be held every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer.... There is no question that respondents' sincerely held religious beliefs compelled attendance at Jumu'ah." *Id.* at 345, 107 S.Ct. 2400 (internal citations omitted). Indeed, when it reached the second prong of the *Turner* test, the Court noted that, "of course, there are no alternative means of attending Jumu'ah." *Id.* at 351, 107 S.Ct. 2254. The *O'Lone* plaintiffs did, however, have alternative means of expressing their Muslim faith generally. The Court explained:

[W]e think it appropriate to see whether· under the[ ] [prison's] regulations respondents retain the ability to participate in other Muslim religious ceremonies. The record establishes that re-

spondents are not deprived of *all* forms of religious exercise, but instead freely observe a number of their religious obligations. The right to congregate for prayer or discussion is virtually unlimited except during working hours, ... and the state-provided imam has free access to the prison. Muslim prisoners are given different meals whenever pork is served in the prison cafeteria. Special arrangements are also made during the month-long observance of Ramadan, a period of fasting and prayer.... We think this ability on the part of respondents to participate in other religious observances of their faith supports the conclusion that the restrictions at issue here were reasonable.

*Id.* at 352, 107 S.Ct. 2400 (emphasis added) (internal citation and quotation omitted).

In *Thornburgh,* the Supreme Court elaborated on how courts should define the right in question when performing the "alternatives" analysis envisioned by the second prong of *Turner.* Specifically, the Court stated:

The Court in *Turner,* [where a prison regulation barred correspondence between inmates in different institutions], did not require that prisoners be afforded other means of communicating with inmates at other institutions, 482 U.S. at 92, 107 S.Ct. 2254, ... nor did it in *O'Lone* require that there be alternative means of attending the Jumu'ah religious ceremony, 482 U.S. at 351, 107 S.Ct. 2400 .... Rather, it held in *Turner* that it was sufficient if other means of expression (not necessarily other means of communicating with inmates in other prisons) remained available, and in *O'Lone* if prisoners were permitted to participate in other Muslim religious ceremonies....

*Id.* at 417–18, 109 S.Ct. 1874. It follows from *Thornburgh* that, when we are deciding whether DeHart has alternative means of exercising the circumscribed right, the "right" which is being circumscribed is his right to free religious expression. In oth-er words, we must inquire whether De-Hart has alternative means of exercising his Buddhist beliefs generally (*e.g.,* by prayer, worship, meditation, scripture study, etc.).

DeHart testified before the Magistrate Judge that he is permitted to pray, to recite the Sutras, to meditate, and to correspond with the City of 10,000 Buddhas, a center of Buddhist teaching. In addition, the prison has allowed DeHart to purchase and use special items, such as canvas (as opposed to leather) sneakers. *See* App. 304–05. Thus, there are other avenues of religious practice open to him at SCI–Greene, and these alternative means of expressing his Buddhist faith must be taken into account in determining the overall reasonableness of the prison's decision not to afford him a special diet.

We will require reconsideration of this second *Turner* factor on remand for two reasons. First, the District Court understandably considered itself bound by our decision in *Johnson* to determine whether vegetarianism is a "commandment" for Buddhists or only a "positive expression of belief." We hold today, however, that this distinction is inconsistent with controlling Supreme Court authority. Second, while the District Court accepted the fact that vegetarianism is a commandment in De-Hart's sincerely held religious belief system, it erroneously concluded that De-Hart's interest in practicing vegetarianism could be discounted solely because the adherents of the "three major traditions of Buddhist practice" did not share DeHart's view that a vegetarian diet was mandatory.

■ As DeHart stresses, *Johnson* did direct an inquiry into "the centrality of the religious tenet" at issue and distinguished between "religious commandments" and "positive expression of belief," suggesting that "the importance of alternative means of religious observance is an irrelevant consideration" when the practice in question is a commandment. *Johnson v. Horn,* 150 F.3d 276, 282 (3d Cir.1998). We are

now convinced, however, that the distinction we recognized in *Johnson* is inconsistent with both Supreme Court precedent and our own caselaw. Accordingly, we overrule the analysis in *Johnson* pertaining to the second prong of the *Turner* analysis.

In *Johnson*, the Court said the following:

> [T]he importance of alternative means of religious observance is an *irrelevant consideration* when the belief at issue is a "religious commandment," rather than a "positive expression of belief." [*Ward v. Walsh*, 1 F.3d 873, 878 (9th Cir.1993).] As the United States Court of Appeals for the Ninth Circuit has stated: "It is one thing to curtail various ways of expressing belief, for which alternative ways of expressing a belief may be found. It is another thing to require a believer to defile himself, according to the believer's conscience, by doing something that is completely forbidden by the believer's religion." *Id.* ... By acknowledging this, we do not intend to suggest that all "religious commandments" must be accommodated, whatever their costs to legitimate penological concerns. However, in such situations *the centrality of the religious tenet carries greater weight and the existence of alternative means of observance is of no use in the ultimate balancing which* Turner *commands.*

*Johnson*, 150 F.3d at 282 (emphasis added).

Thus, under *Johnson* where the religious practice being prohibited by the prison is commanded by the believer's faith, the existence of other opportunities for exercising one's religious faith is wholly irrelevant to the analysis. The "religious commandment"/"positive expression of belief" distinction on which the panel in *Johnson* relied, however, directly conflicts with the Supreme Court's analysis in *O'Lone.* The Court there expressly held that, although attendance at Jumu'ah was a requirement of the respondents' religion (*i.e.*, a "religious commandment"), because other means of practicing their religion were available, the second *Turner* factor weighed in favor of the relevant restriction's reasonableness. Recognition that a particular practice is required by an inmate's religion, thus, does not end this portion of the analysis. Rather, as the Supreme Court made clear in *O'Lone* and *Thornburgh,* courts must examine whether an inmate has alternative means of practicing his or her religion generally, not whether an inmate has alternative means of engaging in the particular practice in question.

Nor, we believe, was the second factor of the *Turner* test intended to require courts to determine whether an inmate's sincerely held religious belief is sufficiently "orthodox" to deserve recognition. As we have noted, not only did the District Court undertake to evaluate the "centrality" of a vegetarian diet in the Buddhist faith, it also purported to determine what was generally accepted Buddhist doctrine and to discount DeHart's sincerely held religious belief because it was not in that mainstream.[4] This is simply unacceptable.

4. The District Court made the following findings:

> Plaintiff practices Mahayana Buddhism, which is one of three major traditions of Buddhist practice, along with the Hinayana and Vajrayana traditions.... He has obtained information from the City of Ten Thousand Buddhists in this respect. Mr. McKinney spoke to two members of the Board of Directors for the City of Ten Thousand Buddhas immediately prior to the hearing in this matter, and they informed him that vegetarianism is a "branch, not a root of their particular approach to Buddhism."
> While supporting plaintiff's right to pursue Buddhism as plaintiff understands it, Mr. McKinney stated that no one practice is an absolute necessity for Buddhism, and that one should "practice what one is able to practice within the environment and conditions that one can." Mr. McKinney also opined that sutras are guidelines, and that plaintiff is interpreting them "in a very literalistic manner."

It would be inconsistent with a long line of Supreme Court precedent to accord less respect to a sincerely held religious belief solely because it is not held by others.[5]

The Supreme Court cautioned in *Employment Division v. Smith:*

> "[I]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Commissioner,* 490 U.S. [680,] 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 [(1989)]. Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim.

494 U.S. 872, 886–87, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (plurality opinion). Although the Court was divided in *Smith,* the concurring and dissenting opinions both expressly agreed with the majority's admonition. *See id.* at 906, 110 S.Ct. 1595 (O'Connor, J., concurring) ("I agree with the Court ... [that] '[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith.'") (*quoting Hernandez*); *id.* at 919, 110 S.Ct. 1595 (Blackmun, J., dissenting) ("I agree ... that courts should refrain from delving into questions whether, as a matter of

religious doctrine, a particular practice is 'central' to the religion").

*Smith* is not an aberration. Rather, it is part of a consistent and resounding theme echoed throughout many Supreme Court opinions. *See Thomas v. Review Bd. of Indiana Employment Security Div.,* 450 U.S. 707, 715–16, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) ("[T]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect.... [I]t is not within the judicial function and judicial competence to inquire [who has] more correctly perceived the commands of their common faith."); *Jones v. Wolf,* 443 U.S. 595, 602–06, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979); *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem. Presbyterian Church,* 393 U.S. 440, 450, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969) ("the First Amendment forbids ... courts from ... assessing the relative significance to the religion of the tenets"); *United States v. Ballard,* 322 U.S. 78, 85–87, 64 S.Ct. 882, 88 L.Ed. 1148 (1944); *see also Africa v. Pennsylvania,* 662 F.2d 1025, 1030 (3d Cir.1981) ("Judges are not oracles of theological verity, and the Founders did not intend for them to be declarants of religious orthodoxy."); *id.* at 1034 n. 18 ("[T]he judicial branch is nei-

---

What the court is faced with, then, is a situation where plaintiff may sincerely believe that he would defile himself by not following the strict vegetarian diet he has described. His belief, however, is clearly not shared by any other Buddhist identified to the court, and is specifically rejected as a "central" tenet by the very sect of Buddhists to which plaintiff has appealed for guidance in the past.

 \*     \*     \*

Since vegetarianism is neither a central part of Buddhism, nor a commandment of that religion, plaintiff's wish to pursue vegetarianism must be considered an expression of his faith as opposed to his adherence to a religious commandment. This being the case, the existence of alternative means of expression, including prayer and possession of religious texts, makes this factor one which weighs in the prison's favor as well.

Dist. Ct. Slip Op. at 16, 17 (internal citations omitted).

**5.** We stress that the second factor of the *Turner* test is directed solely to evaluating the interest of the inmate in having his request accommodated. Our holding with respect to the impropriety of disregarding a sincerely held belief solely because it is not an orthodox one relates specifically to the issue of whether alternative means of expression are available to the inmate. As we note, hereafter, in the context of the third *Turner* factor, our holding with respect to the second factor does not mean that it is impermissible for prison officials to distinguish between different categories of religious believers when such a distinction is reasonably related to legitimate penological interests. *See* pp. 58–59, *infra.*

ther authorized nor equipped to pronounce upon the veracity of a religious precept.").[6]

In summary, where a prison regulation limits an inmate's ability to engage in a particular religious practice, the second prong of *Turner* requires an examination of whether there are other means available to the inmate for expressing his religious beliefs. If the prison does afford the inmate alternative means of expressing his religious beliefs, that fact tends to support the conclusion that the regulation at issue is reasonable. In this case, the record shows that, while the prison's regulations have prohibited DeHart from following a diet in conformity with his religious beliefs, he has some alternative means of expressing his Buddhist beliefs.

### 3. Remaining Factors and the Weighing Process

The first two *Turner* factors focus on the prison's decision—to what extent is it justified by legitimate and neutral concerns and what options does it leave open to the inmate; in this case, both of those factors suggest that the prison's decision not to provide DeHart with a diet in conformity with his religious beliefs is reasonable. The third and fourth factors, on the other hand, focus on the specific religious practice or expression at issue and the consequences of accommodating the inmate for guards, for other inmates, and for the allocation of prison resources.

As we have previously noted, DeHart desires a meal, served concurrently with the therapeutic meals, consisting of an eight-ounce cup of soy milk and increased portions of the non-meat and non-dairy items from the master menu. The soy

milk supplement is the only item DeHart requests that is not currently purchased by the DOC. The District Court found that the prison could provide DeHart a cup of the soy milk at each meal for a total cost of $1.71 per day.

The District Court's analysis of the third *Turner* factor was as follows:

> The third factor in the *Turner* test is the impact which providing plaintiff a strict vegetarian diet would have on the institution, guards and other inmates. There is no undisputed evidence concerning the impact this factor has, and it is neutral for purposes of the motion for summary judgment.

Dist. Ct. Slip Op. at 17. With respect to the fourth factor, the District Court concluded that "the cost factor favors the prison, while the fact that an available alternative exists favors plaintiff's position. This factor is also neutral." Dist. Ct. Slip Op. at 18.

The District Court ultimately granted summary judgment against DeHart on the following ground:

> Considering the evidence in the light most favorable to plaintiff, two of the four *Turner* factors weigh in favor of defendants, while the final two factors are neutral. Thus, the court concludes that application of the *Turner* balancing test results in the conclusion that the First Amendment does not require Prison Officials to provide plaintiff a vegetarian diet.

*Id.*

The District Court's analysis of the third factor is unacceptable. It is true that there

---

**6.** We recognize that the views we here express are in tension with the recent decision of the Sixth Circuit Court of Appeals in *Spies v. Voinovich*, 173 F.3d 398 (6th Cir.1999). The prisoner there desired a strict vegan meal—*i.e.*, absolutely no foodstuff derived from animals—in conformity with his Buddhist religious beliefs. He conceded that, while a vegetarian diet *was* required by Buddhism, a *vegan* diet was not. The prison had provided the prisoner with a vegetarian diet,

but it refused to provide a vegan diet. The prisoner brought suit, alleging infringement of his Free Exercise rights. The Sixth Circuit Court of Appeals held that, although Spies's vegan beliefs were sincerely held religious beliefs, because they were not *required* by Buddhism, the prison could continue to provide a vegetarian meal. While the result reached in *Spies* may be an appropriate one, we respectfully disagree with the Court's analysis.

is "no undisputed evidence" regarding the impact that accommodating DeHart would have on the prison community. DeHart's evidence regarding the service of therapeutic meals and what it would take to meet his religious requirements would support an inference that any impact would be insubstantial. On the other hand, the defendants have tendered evidence tending to show that, if DeHart is accommodated, others will demand similar treatment. But the fact that there is no undisputed evidence is not a reason for concluding that the third factor is neutral. If there is conflicting evidence, the conflict needs to be resolved and findings need to be made about the size and quality of the impact on the prison community. Without such findings, it is not possible for the District Court to engage in the weighing process that *Turner* envisions.

One piece of evidence regarding the impact of DeHart's request on the prison community is particularly worthy of mention. DeHart brought to the District Court's attention the fact that the same prison administration had urged the Court in the *Johnson* case not to order them to provide kosher meals to Jewish inmates because the prison was voluntarily providing such a diet. DeHart further pointed out that the kosher diet being voluntarily provided consisted of milk, uncut fruit and vegetables, and a nutritional supplement, and that the cost to the prison for these kosher meals was substantially more than

the cost of the liquid supplement diet he was requesting.[7] The defendants comment on these facts only in response to DeHart's Equal Protection argument. Their sole response is: "In *Johnson*, the Court was presented with kosher laws that are a commandment of the Orthodox Jewish faith. . . . Here, vegetarianism while an expression of belief, is not a commandment of Buddhism." Appellees' Br. at 29.

We address hereafter the significance of this distinction in our discussion of DeHart's Equal Protection claim. The important point in the context of the Free Exercise claim and the third factor of the *Turner* test, however, is that the defendants' treatment of Jewish inmates, in the absence of some further explanation, casts substantial doubt on their assertion that accommodating DeHart's request would result in significant problems for the prison community. We, of course, do not rule out the possibility that there may be a satisfactory explanation for this apparent disparity in treatment. The Jewish inmates in *Johnson* were not, as we understand it, in the same institution as DeHart. But the third factor cannot be satisfactorily evaluated without taking into account the fact that the dietary needs of Jewish inmates are apparently accommodated without substantial negative consequences in terms of efficiency and security. Similarly, it is difficult to see how one can determine under the fourth factor whether DeHart's requested diet places more than

---

**7.** DeHart also called to the Court's attention the following observations of the District Court during the initial stage of the *Johnson* case:

> The facts as to which there is no genuine dispute may be summarized as follows: 1) keeping kosher is a religious obligation central to the practice of Orthodox Jews, including plaintiffs; 2) although there are increased dollar costs associated with accommodating a kosher diet, those costs are not significant in light of the nature of the diet which plaintiffs testified they could eat and remain kosher in accordance with the advice of their religious leaders; 3) there are no realistic grounds for believing that accommodating the plaintiffs' kosher diet

will have any impact on the defendants' legitimate goals of maintaining institutional order and safety, and the marginal administrative costs of separating genuine from false claims that a prisoner is an Orthodox Jew who is required to keep kosher, in light of the administrative apparatus already in place in the Department of Corrections, is minimal.

I conclude that there is a constitutional right for these plaintiffs as Orthodox Jews to keep kosher as described in the evidentiary record of this case, i.e., to a kosher diet not requiring the establishment of a separate kitchen or segregated handling procedures.

App. at 152.

a de minimis burden on prison resources without taking the treatment of Jewish inmates into account.

■ *Turner* does not call for placing each factor in one of two columns and tallying a numerical result. The objective is to determine whether the regulation is reasonable given the prison administrators' penological concerns and the inmate's interest in engaging in the constitutionally protected activity. We agree with the defendants that where, as here, "other avenues" remain available for the exercise of the inmate's religious faith, "courts should be particularly conscious of the 'measure of judicial deference owed to correction officials....'" *Turner,* 482 U.S. at 90, 107 S.Ct. 2254 (*quoting Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974)). Nevertheless, *Turner* does contemplate a judgment by the court regarding the reasonableness of the defendant's conduct under all of the circumstances reflected in the record.[8] A

decision or practice that represents an "exaggerated response" to even a legitimate penological concern will not justify an infringement of First Amendment rights. *See id.* at 87, 107 S.Ct. 2254. This is a case in which (1) the designated penological interests to be served are efficiency and avoidance of inmate jealousy, (2) there is an existing administrative process in the institution for serving individually prepared meals and DeHart has made a *prima facie* showing that this process can accommodate his religious needs with the addition of a cup of soy milk, and (3) the defendants in other institutions are served kosher meals which would appear, without further explanation, to impose a greater burden on prison efficiency and occasion a similar risk of jealousy. In such circumstances, *Turner* requires a more thorough analysis of the reasonableness of the restriction imposed on DeHart's religious expression. Accordingly, we will reverse the summary judgment of

8. The Court of Appeals cases dealing with inmate requests for religious diets do not reach a uniform result. This reflects, in large part, a recognition that the issue in such cases requires a contextual, record-sensitive analysis.

For cases concluding that the record mandated provision of a religious diet, *see Makin v. Colorado Dept. of Corrections,* 183 F.3d 1205, 1211 (10th Cir.1999) (prison officials' failure to accommodate inmate's meal requirements during the Muslim holy month of Ramadan violated his First Amendment right to free exercise of his religion); *Johnson v. Horn,* 150 F.3d 276 (3d Cir.1998) (holding that prison must provide kosher diet to Jewish inmates); *Ashelman v. Wawrzaszek,* 111 F.3d 674 (9th Cir.1997) (holding that prison must provide prisoners with nutritional diet in conformity with kosher laws); *Whitney v. Brown,* 882 F.2d 1068 (6th Cir.1989) (holding that prison must permit Jewish inmates to hold modified Passover Seders); *Kahane v. Carlson,* 527 F.2d 492 (2d Cir.1975) (requiring prison to provide a kosher diet).

For cases finding the record inadequate to determine whether a religious diet was required, *see Ward v. Walsh,* 1 F.3d 873 (9th Cir.1993) (recognizing general right to a religious diet but remanding for an evaluation of the prison's interests in denying the diet); *LaFevers v. Saffle,* 936 F.2d 1117 (10th Cir.

1991) (reversing District Court's dismissal of prisoner's claim that prison's failure to provide a vegetarian diet violated his First Amendment rights); *Hunafa v. Murphy,* 907 F.2d 46 (7th Cir.1990) (remanding case involving Muslim prisoner's claim that failure to provide a diet without pork violated his First Amendment rights because of insufficient evidence in the record to gauge the magnitude of the prison's administrative and security concerns); *McElyea v. Babbitt,* 833 F.2d 196 (9th Cir.1987) (per curiam) (recognizing general right of prisoners to a diet in conformity with their religious beliefs but remanding due to an issue of fact as to the sincerity of the prisoner's belief).

For cases finding the record sufficient to sustain a denial of a religious diet, *see Kahey v. Jones,* 836 F.2d 948 (5th Cir.1988) (holding that prison was not required to provide a diet consistent with prisoner's religious beliefs because doing so would create administrative difficulties); *Martinelli v. Dugger,* 817 F.2d 1499, 1507 n. 29 (11th Cir.1987) (upholding prison's policy of not providing kosher diet a Jewish inmate because doing so would "require excessive budgetary allowances").

*See also Bass v. Coughlin,* 976 F.2d 98 (2d Cir.1992) (per curiam) (clearly established for qualified immunity purposes that "prison officials must provide a prisoner a diet that is consistent with his religious scruples").

the District Court and remand so that the parties may more fully develop the record and the Court may inquire more deeply into the relevant issues.

In the interest of avoiding miscommunication, we make one final comment on the Free Exercise issue. The defendants suggest in the context of the second *Turner* factor and DeHart's Equal Protection claim that DeHart might be entitled to a religious diet if it were required by the Buddhist faith, *i.e.,* if he were able to point to some institutional verification for his belief. We do not understand them to contend in the context of the third *Turner* factor that an inability to treat sincere, but unorthodox, religious believers differently than orthodox adherents to traditional faiths would substantially burden prison resources or prison administration. We do not, of course, suggest that such is the case. We note only that nothing said in this opinion bars prison officials in a religious diet case from attempting to make such an argument.

A case from the Supreme Court may help to illustrate the distinction that we here posit. In *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam), the plaintiff inmate was Buddhist. He complained that adherents of other religions were permitted to exercise their religious faiths in ways that he was not. Allegedly, the prison encouraged participation in other religious programs but discouraged the practice of Buddhism. The plaintiff's complaint was dismissed for failure to state a claim. The Supreme Court reversed, observing:

> If Cruz was a Buddhist and if he was denied a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts, then there was palpable discrimination by the State against the Buddhist religion. . . .

The First Amendment, applicable to the States by reason of the Fourteenth Amendment, *Torcaso v. Watkins,* 367 U.S. 488, 492–493, 81 S.Ct. 1680, 6 L.Ed.2d 982 [ (1961) ], prohibits government from making a law "prohibiting the free exercise" of religion. If the allegations of this complaint are assumed to be true, as they must be on the motion to dismiss, Texas has violated the First and Fourteenth Amendments.

*Id.* at 322, 92 S.Ct. 1079.

The Court then added the following footnote:

> We do not suggest, of course, that every religious sect or group within a prison—however few in number—must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regarded to the extent of the demand. But reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty.

*Id.* at 322 n. 2, 92 S.Ct. 1079.

The Supreme Court was speaking of disparate treatment of adherents of different religious faiths, not disparate treatment of orthodox and non-orthodox adherents of the same religion. In the context of the third *Turner* factor, the situations may be analogous, however. In other words, the fact that it is impermissible to discriminate against an inmate solely because of the non-orthodox character of his or her faith does not exclude the possibility that there may be legitimate administrative burdens or other penological concerns that will justify distinguishing between orthodox and non-orthodox believers.[9] As

---

9. Similarly, our rejection of *Johnson* 's "commandment"/"positive expression of belief" distinction in the context of the second *Turner* factor does not rule out the possibility that legitimate penological concerns may properly allow prison officials to consider the extent to

we have indicated, however, we will leave resolution of that issue for another day.

## IV.

DeHart's Equal Protection claim focuses on the Jewish inmates in *Johnson* whose dietary restrictions were accommodated by the defendants. *Turner* is equally applicable here, and the appropriate analysis for this claim is the same as that for DeHart's Free Exercise claim. *See Turner*, 482 U.S. at 89, 107 S.Ct. 2254 ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."). Once again, we note that the stipulation regarding De-Hart's sincerity and the religious nature of his dietary request establishes that he has a constitutionally protected interest. Clearly, absent a compelling interest, the state could not favor others and disfavor DeHart, in the context of society at large, based on the character of his religious beliefs. *See Maldonado v. Houstoun*, 157 F.3d 179, 184 (3d Cir.1998) (holding that a classification that draws upon suspect distinctions, such as religion, "is subject to strict scrutiny and will pass constitutional muster only if it is narrowly tailored to serve a compelling state interest"). Nevertheless, DeHart cannot obtain relief if the difference between the defendants' treatment of him and their treatment of Jewish inmates is "reasonably related to legitimate penological interests." *See Clark v. Groose*, 36 F.3d 770, 773 (8th Cir.1994) (holding that in order for an inmate to recover on an equal protection claim, the inmate "must prove that the distinction between himself and the other

inmates was not reasonably related to some legitimate penological purpose.").

As we have earlier noted, the defendants explain that they provide kosher diets to Orthodox Jewish inmates because such diets "are a commandment of the [O]rthodox Jewish faith" and that they have denied DeHart the diet that his personal religious faith mandates because such a diet "is not a commandment of Buddhism." Appellees' Brief at 29.[10] Neither the defendants nor the District Court has explained, however, how this distinction is reasonably grounded in legitimate penological concerns, and any nexus between the two is not self-evident.[11] In the absence of such a nexus, the distinction drawn between orthodox and non-orthodox believers cannot justify the refusal of De-Hart's request. Accordingly, we will remand this issue as well for further development and factual findings.

## V.

The judgment of the District Court will be reversed, and this matter will be remanded to the District Court for further proceedings consistent with this opinion.

---

which an individual sincerely believes that a given practice is a fundamental component of his or her religious faith.

10. The defendants also argue that the record is devoid of any evidence of a discriminatory intent on their part. A fair inference can be drawn from the record, however, that the relevant disparity in treatment was the result of deliberate choice.

11. Under the deferential *Turner* standard, a prison administration that leaves open other avenues for religious expression can deny dietary requests that impose substantial burdens on valid penological interests. In this context, it is not readily apparent why a prison administration should be concerned with whether the request comes from a sincere orthodox believer or a sincere non-orthodox one.