SCIRICA, Circuit Judge,
concurring.
Although I believe the revised Department of Corrections policy represents the better practice and avoids potential problems in the free exercise of an inmate’s religion, I believe the prior policy was facially valid. But the prison administrators impermissibly denied access to Nation of Islam materials because they found, improperly in my view, that the documents did not constitute religious material. For this reason, I agree that the prior policy was unconstitutional as applied.
I.
But it seems to me that under Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the prison authorities promulgated a rational and neutral policy, reasonably grounded on behavior modification principles. Arguably, had the corrections officials adopted a broader view of “religion,” the Nation of Islam materials, at least, in Phases III and II would have been permitted. And depending on whether the officials considered Nation of Islam materials the equivalent of the Bible or Qur’an, they could have been permitted at Phases V and IV.
Under an expansive interpretation of what constitutes religious materials, therefore, the prior policy arguably could be rational and neutral, and reasonably grounded on acceptable behavior modification principles. Department of Corrections Regional Deputy Commissioner Dr. Beard explained that this incentive-based program was developed to improve upon traditional restrictive housing units which were not programmed to address the needs of inmates with a long-term inability to adjust to general population status. To this end, the SMU “provide[d] structured progression through five phases.... The program provide[d] security for staff and inmates alike while giving the inmate an incentive to progress through the phases of the program.... ” To the extent that some of those inmates were religious, conditioning access to religious materials on improved behavior might very well have served as a powerful incentive for the desired change in behavior.[1]
*261 Furthermore, the District Court found that “the SMU rules were not created to target [Nation of Islam] members, and the rules applied to each prisoner no matter what his religion.” Sutton, No. 97-7096, at 12. It bears noting as well that as the prisoner progressed through administrative confinement, he regained other privileges besides access to additional religious materials. For these reasons, defendants have arguably demonstrated a “valid, rational connection” to the “legitimate and neutral governmental objective” of behavior modification. Cf. Thornburgh v. Abbott, 490 U.S. 401, 414-15, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).
II.
I also believe that the second Turner prong favors defendants. As the court notes, in a free exercise case, we must consider whether the inmate has “alternate means of practicing his or her religion generally, not whether [the] inmate has alternative means of engaging in [any] particular practice.” DeHart v. Horn, 227 F.3d 47, 55 (3d Cir.2000) (en banc). “When assessing the availability of alternatives, the right in question must be viewed ‘sensibly and expansively.’ ” Fraise, 283 F.3d at 518 (quoting DeHart, 227 F.3d at 53-55). In DeHart, we overruled the analysis in Johnson v. Horn, 150 F.3d 276 (3d Cir.1998), that focused on “ ‘the centrality of the religious tenet’ at issue and distinguished between ‘religious commandments’ and ‘positive expression of belief,’ suggesting that ‘the importance of alternative means of religious observance is an irrelevant consideration’ when the practice in question is a commandment.” 227 F.3d at 54. We then said:
Thus, under Johnson where the religious practice being prohibited by the prison is commanded by the believer’s faith, the existence of other opportunities for exercising one’s religious faith is wholly irrelevant to the analysis. The “religious commandment”/“positive expression of belief’ distinction on which the panel in Johnson relied, however, directly conflicts with the Supreme Court’s analysis in O’Lone. The Court there expressly held that, although attendance at Jumu’ah was a requirement of the respondents’ religion (i.e., a “religious commandment”), because other means of practicing their religion were available, the second Turner factor weighed in favor of the relevant restriction’s reasonableness. Recognition that a particular practice is required by an inmate’s religion, thus, does not end this portion of the analysis. Rather, as the Supreme Court made clear in O’Lone and Thornburgh, courts must examine whether an inmate has alternative means of practicing his or her religion generally, not whether an inmate has alternative means of engaging in the particular practice in question.... In this case, the record shows that, while the prison’s regulations have prohibited DeHart from following a diet in conformity with his religious beliefs, he has some alternative means of expressing his Buddhist beliefs.”
Id. at 55, 57.
We further said that where “other avenues remain available for the exercise of the inmate’s religious faith, courts should be particularly conscious of the measure of judicial deference owed to correction officials .... ” DeHart, 227 F.3d at 59 (quoting Turner, 482 U.S. at 90, 107 S.Ct. 2254) *262 (internal quotations omitted). The second factor is not “intended to require courts to determine whether an inmate’s sincerely-held religious belief is sufficiently ‘orthodox’ to deserve recognition.” DeHart, 227 F.3d at 55. Under this factor, “we must of course focus on the beliefs of the inmate asserting the claim. It is obviously impossible to determine whether a regulation leaves an inmate with alternative ways of practicing the inmate’s religion without identifying the religion’s practices.” Fraise, 283 F.3d at 518.
In Fraise, we concluded the second Turner prong was satisfied where inmates’ access to Five Percent[2] literature was only “partially restricted.” Id. at 519. The Fraise prison regulations allowed New Jersey correctional officers to designate security threat groups (STGs) and transfer core members to a special unit where their ability to “study the lessons” (a central Five Percent practice) was strictly controlled for fear of gang violence linked with the group. Id. Although Five Per-centers were not allowed possession of “distinctively Five Percent National literature,” they were still permitted to “possess, study and discuss” the Bible and the Qur’an. Id. We stated, “To be sure, the STG Policy restricts the ability of Five Percenters to achieve [self-knowledge, self-respect, responsible conduct or righteous living] by following what the group may regard as the best avenue, i.e., by studying and discussing doctrines and materials distinctive to the Five Percent Nation. But alternative avenues clearly remain open.” Id.
As the court notes, the inmates in question here are adherents of various Nation of Islam sects.[3] Plaintiffs’ expert opined that the Nation of Islam Books requested were “essential” to the practice of their religion. But alternative means of worship were clearly available to the plaintiffs. Even though plaintiffs were denied access to distinctly Nation of Islam texts, they were still allowed access to the Qur’an or Bible, like the Fraise inmates. As the District Court found, Nation of Islam members in the SMU were “permitted to exchange books, e.g., the Bible for the Koran .... and [t]hey could celebrate religious holidays such as Ramadan in the company of other prisoners.” Sutton, No. 97-7096, at 5. Thus, SMU inmates had access to the Bible, Qur’an, or equivalent religious texts, and they could pray by themselves, speak with and be visited by religious advisors, and celebrate religious holidays. Cf. Fraise v. Terhune, 283 F.3d 506, 519-20 (upholding a prison policy in an as-applied challenge where inmates in restrictive custody were only “partially restricted” in their ability to practice religion because “the policy allowed inmates to possess, study and discuss the Bible and the Koran” and did not restrict religious inmates from seeking “self-knowledge” or “righteous living”). While the original SMU policy undoubtedly imposed restrictions on the ability of Nation of Islam members to engage in activities related to the group, plaintiffs retained sufficient alternative means of studying and practicing *263 doctrines distinct to their religion.[4] Cf. Fraise, 283 F.3d at 520. I see no principled distinction here from the circumstances we faced in Fraise, which found that sufficient alternative means of worship were retained. Therefore, I believe the second Turner prong favors defendants here.
In all other respects, I join the court’s opinion.

. As the District Court found, the SMU incentive-based program was "very successful” because from "April 1992 to October 1993 of the 45 inmates admitted to the program 19 *261 graduated to general population status and only 3 of those had [to] be returned to the SMU.” Sutton, No. 97-7096, at 12.

. The Five Percenters broke away from the Nation of Islam in the 1960s. They believe in a "Supreme Mathematics.” The "Five Percent” includes African Americans who have achieved self-knowledge. Fraise, 283 F.3d at 511. Five Percenters "reject[] belief in the transcendent and instead focus[] on human enlightenment and conduct as ends in themselves.” Id. at 518 (examining evidence of the Five Percenters beliefs and practices as submitted by an editor of a Five Percent newspaper).

. Sutton is a member of a Nation of Islam sect led by Minister Farrakhan, Wise is a member of the Lost-Found Nation of Islam, Inc., and Walker is a member of both.

. As noted, we said in DeHart, "[T]he Supreme Court made clear in O’Lone and Thornburgh, courts must examine whether an inmate has alternative means of practicing his or her religion generally, not whether an inmate has alternative means of engaging in the particular practice in question.” 227 F.3d at 55.