

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-16-2004

# Robert Perry Dehart v. Martin Horn

Precedential or Non-Precedential: Precedential

Docket No. 03-4250P

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Robert Perry Dehart v. Martin Horn" (2004). *2004 Decisions*. Paper 106.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/106

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL
UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT
_____

No. 03-4250
_____

ROBERT PERRY DEHART,

Appellant

v.

MARTIN HORN, Commissioner of
Corrections; JAMES S. PRICE,
Superintendent SCI Greene; UNITED
STATES OF AMERICA
(Intervenor in D.C.)

_____

On Appeal From the United States
District Court for the Western District of
Pennsylvania
(D.C. Civ. No. 95-cv-01238)
District Judge:  The Honorable
William L. Standish

Argued October 1, 2004

BEFORE: ROTH and CHERTOFF,
Circuit Judges and
IRENAS,* Senior District Judge.

_____

*       Honorable Joseph E. Irenas,
Senior District Judge for the United
States District Court for the District of
New Jersey, sitting by designation.

(Filed: November 16, 2004)

Edward A. Olds, Esq. (Argued)
1007 Mount Royal Boulevard
Pittsburgh, PA 15223
        Counsel for Appellant

Gerald J. Pappert, Attorney General
J. Bart DeLone, Esq. (Argued)
Calvin R. Koons, Esq.
John G. Knorr, III, Esq.
Office of the Attorney General
Appellate Litigation Section
15th Floor, Strawberry Square
Harrisburg, PA 17120

Rodney M. Torbic, Esq.
Office of the Attorney General
564 Forbes Avenue
5th Floor
Manor Complex
Pittsburgh, PA 15219

        Counsel for Appellees Martin Horn
        and James S. Price

Bonnie R. Schlueter, Esq.
Office of United States Attorney
700 Grant Street
Suite 400
Pittsburgh, PA 15219

Catherine Y. Hancock, Esq.
United States Department of Justice
Civil Division, Appellate Staff
601 D. Street, N.W.
Suite 9547
Washington, D.C.  20530

Michael S. Raab, Esq.
United States Department of Justice
Civil Division, Appellate Staff
601 D Street, N.W.
Room 9136
Washington, D.C. 20530

Counsel for Appellee USA

---

OPINION OF THE COURT

---

IRENAS, Senior District Judge.

Robert Perry DeHart ("DeHart") is an inmate at SCI-Greene ("the Prison"), a Pennsylvania state correctional facility. He is serving a life sentence for murder, as well as shorter consecutive sentences for robbery, burglary and escape, and has been incarcerated in the state correctional system since 1980. He brings this action pursuant to 42 U.S.C. § 1983 against Martin Horn, Pennsylvania's Commissioner of Corrections, and James S. Price, the Superintendent of the Prison ("Appellees"), alleging that his Free Exercise and Equal Protection rights under the First and Fourteenth Amendments were violated by the Prison's refusal to provide him with a diet comporting with his Buddhist beliefs. DeHart also brought a claim pursuant to the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § § 2000cc *et seq.* (2000) ("RLUIPA"). The District Court of the Western District of Pennsylvania granted summary judgment for the Appellees on DeHart's constitutional claims, and dismissed his RLUIPA claim for failure to comply with the exhaustion requirement of 42 U.S.C. § 1997e(a). We affirm the District Court's grant of summary judgment as to the constitutional claims and reverse the dismissal of DeHart's RLUIPA claim.

**I.**

DeHart is a practitioner of Mahayana Buddhism, a religion to which he was introduced while a prisoner. He has practiced his religion daily since early 1990, although his interest in and study of Buddhism dates back to the early 1980s. He meditates and recites mantras for up to five hours a day and corresponds with the City of Ten Thousand Buddhas, a religious organization located in Talmadge, California. According to DeHart's self-taught understanding of Buddhist religious texts, he is not permitted to eat any meat or dairy products, nor can he have foods containing "pungent vegetables" such as onions, garlic, leeks, shallots and chives. As a result, DeHart became a vegetarian in 1989, and began declining food trays containing meat in 1993. When he does accept food trays, he eats only fruit, certain cereals, salads when served without dressing, and vegetables served with margarine. DeHart supplements his meals with items purchased from the commissary, including peanut butter, peanuts, pretzels, potato chips, caramel popcorn, and trail mix. He requests that the Prison provide him with a diet free of meat, dairy products and pungent

vegetables.

The legal issues related to DeHart's request are best understood against the background of the system employed to feed prisoners in Pennsylvania's correctional facilities. Inmates receive standardized meals prepared pursuant to a master menu, which is designed to provide all of an inmate's daily nutritional requirements. Food for the inmates is purchased and prepared in bulk. Inmates are given limited choice in what appears on their food trays; they are able to decline pork products and elect to receive an alternative protein source, such as tofu or a bean burger, when available. The only deviations from the mass production of meals are for inmates with health conditions necessitating therapeutic dietary modifications and inmates with particular religious dietary restrictions. Doctors prescribe a variety of therapeutic diets, and the master menu includes seven different menus for diabetic inmates, sodium and fat restricted menus, and a menu for inmates with renal problems. Jewish inmates who adhere to a kosher diet receive special meals in the form of a "cold kosher bag," which contain raw fruits and vegetables, Ensure® dietary supplements, pretzels, crackers, coffee and granola. Muslim inmates receive special meals in their cells during Ramadan, when they observe a daylight fast. The Prison provides a post-sunset evening meal after the normal supper hour and a breakfast bag, called a "Sahoora Bag," to be eaten before sunrise. As a result of concerns about food spoilage and serving temperature, the Sahoora Bag contains some items not served on that day's master menu. Special items for the therapeutic and religious diets are purchased through the medical department and prison commissary.

DeHart submitted a written grievance to the Prison on June 17, 1995, requesting a diet free of "animal products and by-products"consistent with his religious beliefs.[1] After his request for a vegan[2] diet was denied, DeHart unsuccessfully appealed his request to Superintendent Price and the Department of Corrections Central Office Review Committee. He also sent a letter to Commissioner Horn outlining his religious dietary restrictions, dated July 1, 1995. After completing the appeals process within the Department of Corrections, DeHart filed this suit, pursuant to 42 U.S.C. § 1983, in the

---

[1]DeHart also filed an official grievance objecting to the use of butter in the preparation of vegetables a month before, although he did not mention the religious basis for his complaint. DeHart first raised the issue of his religious beliefs in a written letter to Superintendent James Price dated May 22, 1995, in which he specifically mentioned that his Buddhist beliefs prohibited the consumption of meat, dairy and pungent vegetables.

[2]DeHart's proposed diet is referred to in the briefs and court documents alternately as a vegetarian and a vegan diet. Because he refuses to eat meat, fish and dairy products, we will use the term vegan to describe his dietary preferences.

Western District of Pennsylvania.

This appeal marks DeHart's third appearance before this Court. In his first appeal, we affirmed the District Court's denial of preliminary injunctive relief. *DeHart v. Horn*, 127 F.3d 1094 (3d Cir. 1997) (mem.) ("*DeHart* I"). The District Court held that DeHart's request for a preliminary injunction should be denied on the ground that keeping a vegan diet was not a command of Buddhism. Despite upholding the result, this Court emphasized that the District Court should not determine "whether [DeHart's] beliefs are doctrinally correct or central to a particular school of Buddhist teaching." *Id.* at 2.

We next heard DeHart's appeal of the District Court's first grant of summary judgment for the Appellees. The District Court held that the Prison's policy of denying individual dietary requests of inmates was reasonably related to a legitimate penological interest under the standard set out in *Turner v. Safely*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).[3] After the decision of a panel to reverse the District Court's judgment, DeHart's appeal was reheard *en banc*. *DeHart v. Horn*, 227 F.3d 47 (2000) (en banc) ("*DeHart* II"). This Court reversed the lower court's judgment and remanded for reconsideration of the second, third and fourth *Turner* factors. *Id.* In doing so, we overruled the distinction drawn by our

decision in *Johnson v. Horn*, 150 F.3d 276 (3d Cir. 1998), between religious commandments and positive expressions of belief. 227 F.3d at 54. Specifically, we ordered the lower court to reconsider whether DeHart retained other means of exercising his religious beliefs in light of our overruling *Johnson*. *Id.* We also asked the District Court to assess the impact of granting DeHart's request for a meat and dairy-free diet on the prison community in light of the accommodations made to Jewish inmates adhering to the kosher dietary rules. *Id.* at 58-59. With respect to DeHart's Equal Protection claim, we emphasized that our overruling of *Johnson* required Appellees to offer a legitimate penological reason for treating DeHart differently than Jewish inmates other than simply drawing a line between inmates with orthodox and non-orthodox religious beliefs. *Id.* at 61.

On remand after *DeHart* II, the District Court adopted the Magistrate's Report and Recommendation to grant summary judgment for Appellees. *DeHart v. Horn*, No. 95-1238 (W.D. Pa. Sept. 23, 2003). The District Court rejected Appellees' argument that DeHart's beliefs were not sincere and religious in nature. *See* Magis. Rep. & Rec. on Mot. for Summ. J., at R.R. 19a-24a.[4] The lower court concluded that the second *Turner* factor weighed in favor of the Prison because DeHart had more than adequate alternative means of

---

[3] The *Turner* factors are outlined and discussed *infra* Part III.

[4] We use the notation "R.R." to designate page numbers in the Reproduced Record.

expressing his religious beliefs: he was permitted to meditate, recite the Sutras (Buddhist religious texts), correspond with the City of Ten Thousand Buddhas, purchase canvas sneakers instead of leather, have Buddhist materials sent to him from outside the prison and have a Buddhist religious advisor visit him in prison. *See id.* at R.R. 25a-26a. With regard to the third *Turner* factor, the District Court found that the dietary accommodation proposed by DeHart was much more burdensome than what was provided to Jewish and Muslim inmates because his diet would require individualized preparation of meals and special ordering of food items not on the master menu. *See id.* at R.R. 26a-34a. The lower court concluded that DeHart's dietary requests could not be accommodated without imposing more than a de minimis cost on the Prison. *See id.* at R.R. 34a-36a.

DeHart's complaint, as initially filed, also claimed that his right to freely exercise his religious beliefs had been impaired in violation of the Religious Freedom Restoration Act, 42 U.S.C. § § 2000bb *et seq.* (1993) ("RFRA"). In *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed. 624 (1997), the Supreme Court declared RFRA unconstitutional as applied to the States, and DeHart's claim was extinguished. After *DeHart* II and before the lower court's decision on remand, RLUIPA was enacted as a replacement for RFRA. DeHart was granted leave to amend his complaint to state a claim under the new statute. *DeHart v. Horn*, No. 95-1238 (W.D. Pa. Jan. 30, 2001). However, in a separate order, the District Court adopted the Magistrate's Report and Recommendation that DeHart's RLUIPA claim be dismissed for failure to exhaust all administrative remedies as required by 42 U.S.C. § 1997e. *DeHart v. Horn*, No. 95-1238 (W.D. Pa. Feb. 27, 2003). The District Court concluded that RLUIPA adopted a different substantive standard of review for prisoner religious freedom claims than RFRA. *See* Magis. Rep. & Rec. on Mot. to Dismiss, at R.R. 44a. Therefore, because DeHart presented his claim to the prison grievance process while RFRA provided the applicable standard, his claim was no longer exhausted now that it was based on RLUIPA. *See id.* at R.R. 46a.

DeHart appeals both the grant of summary judgment on his First and Fourteenth Amendment claims and the dismissal of his RLUIPA claim.

## II.

We have jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291. Our review of a district court's grant of summary judgment is plenary and we employ the same standard as applied below. *United States ex rel. Quinn v. Omnicare*, 382 F.3d 432, 436 (3d Cir. 2004). A district court may grant summary judgment when there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law. *Id.* Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

5

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In reviewing the grant of summary judgment, we must affirm if the record evidence submitted by the non-movant 'is merely colorable or is not significantly probative.'" *Port Auth. of New York & New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 232 (3d Cir. 2002).

### III.

### A.

In *Turner v. Safely* the Supreme Court identified the crucial balance in assessing inmates' claims that their constitutional rights were violated by prison regulations. While "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution. . . . 'the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree.'" 482 U.S. at 84 (quoting *Procunier v. Martinez*, 416 U.S. 396, 404-405, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974)). Recognizing this tension in principles, *Turner* established the standard of review for prisoner constitutional claims: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably

related to legitimate penological interests." *Id.* at 89. We elaborated in *DeHart* II that:

> [T]his standard of review requires a court to respect the security, rehabilitation and administrative concerns underlying a prison regulation, without requiring proof that the regulation is the least restrictive means of addressing those concerns, it also requires a court to give weight, in assessing the overall reasonableness of regulations, to the inmate's interest in engaging in constitutionally protected activity.

227 F.3d at 51. Thus, DeHart's appeal forces us to resolve the tension between a court's duty to redress constitutional violations resulting from neutral prison regulations and its obligation not to unreasonably interfere with the complex issues involved in managing the day-to-day activities of a prison.

*Turner* articulated a four factor test for determining whether a prison regulation is reasonably related to a legitimate penological interest. 482 U.S. at 79. As we explained in *Waterman v. Farmer*, 183 F.3d 208, 213 n.6 (1999) (citation omitted):

> [*Turner*] requires courts to consider (1) whether a rational connection exists between the regulation and a neutral, legitimate government interest;[5] (2) whether alternative

---

[5]In *DeHart* II we upheld the District Court's finding that this factor favored the Prison. We held that a prison's

6

means exist for inmates to exercise the constitutional right at issue; (3) what impact the accommodation of the right would have on inmates, prison personnel, and allocation of prison resources; and (4) whether obvious, easy alternatives exist.

We cautioned in *DeHart* II that this approach "does not call for placing each factor in one of two columns and tallying a numerical result," but that assessing the reasonableness of a prison regulation requires consideration of all the evidence in the record. 227 F.3d at 59.[6]

When we reversed the District Court's grant of summary judgment in *DeHart* II, we directed the lower court to reevaluate its findings on the second,[7] third and

---

interests in an efficient food system and in avoiding inmate jealousy were legitimate penological concerns. 227 F.3d at 53. Additionally, the Prison's refusal to provide DeHart with a religious diet bore some rational relation to that interest. *Id.*

[6]In *DeHart* II we explained that *Turner* was equally applicable to DeHart's Free Exercise and Equal Protection claims, and that the analysis significantly overlapped. 227 F.3d at 61.

[7]We instructed the lower court to reconsider its analysis of the second *Turner* factor on remand in light of our decision to overrule *Johnson*. 227 F.3d at 54. The District Court subsequently held that this factor also favored the Prison, as DeHart was able to express his

fourth *Turner* factors. 227 F.3d at 57-59. Specifically, we asked the District Court to assess the potential impact on the prison community of granting DeHart's request for a special diet comporting with his religious beliefs in light of the prison system's experience with providing other religious diets. *Id.* at 58. We also asked the lower court to reexamine whether DeHart's religious dietary restrictions could be accommodated in such a way as to impose only a de minimis cost on the Prison. *Id.* We noted that "the defendants' treatment of Jewish inmates, in the absence of some further explanation, casts substantial doubt on their assertion that accommodating DeHart's request would result in significant problems for the prison community." *Id.* We are satisfied that the District Court on remand properly considered the impact on other inmates, guards and the prison administration of providing of religious diets for adherents of other faiths, and we agree that the third *Turner* factor favors the Prison. While neither party separately addressed the lower court's findings on the fourth *Turner* factor in this appeal, we are also satisfied with the District Court's

---

Buddhist beliefs through meditation, correspondence with Buddhist religious organizations, and through the purchase of canvas, rather than leather, sneakers, amongst other accommodations. *See* Magis. Rep. & Rec. on Mot. for Summ. J., at R.R. 19a-24a. DeHart has not appealed this finding, so that only the third and fourth factors are at issue in this appeal.

analysis on that issue.

### B.

The third *Turner* factor requires that we analyze the impact of accommodating DeHart's dietary requests on inmates, prison personnel, and allocation of prison resources. When *DeHart* II was decided, DeHart proposed that he be served a diet created by dietician Karen Avon which modified serving sizes of items on the master menu and added soy milk and whole grain bread as supplements.[8] The Avon diet, however, includes items that contain pungent vegetables.[9] Although

DeHart has repeatedly affirmed the Avon diet, he has also continued to insist that he be served no pungent vegetables.[10]

---

and onions: "garden burgers, the chili, the bean chili, the tofu salad, the stewed tomatoes, the vegetable soup, . . . , the bean and pasta casserole, the vegetable bean soup, . . . , the soy pasta sauce, the pasta bean soup, . . . , the soy barbeque, the fried potatoes, the baked beans, . . . , and the bean burger." Dep. of Margaret Gordon, at R.R. 712a. Avon's proposed menu included stewed tomatoes, baked beans, and beet and onion salad. Aff. of Karen Avon, at R.R. 202a-210a.

[10]DeHart's affidavit submitted in support of his Opposition to the Appellees' Motion for Summary Judgment, which his counsel affirmed during oral argument, included the following statements:

4. I cannot eat dairy products, pungent vegetables, or meat products, in any form and follow my religious beliefs.

5. I would agree to eat extra servings of vegetables, and extra servings of non-meat items such as tofu, beans, soy milk, and peanut butter, *which are consistent with my religious beliefs*. These items, with the exception of soy milk, appear in the main menu offered to all inmates, nearly every day and are readily available. *They are also regularly mixed with onions and garlic, which are prohibited pungent vegetables.*

---

[8]Aff. of Karen Avon, at R.R. 195a-232a. Avon includes as an appendix to her affidavit modifications based on one week's master menu. For example, on Monday inmates were served for supper egg salad made with one egg yolk, three egg whites, onion, celery and mayonnaise, one half cup noodles, one half cup succotash, one half cup beet and onion salad, fresh fruit and eight ounces of skim milk. Avon proposed that DeHart be served one half cup of noodles, one cup succotash, one cup beet and onion salad, two slices of whole grain bread, two teaspoons of margarine, fresh fruit, eight ounces of soy milk and eight ounces of iced tea. *Id.* at R.R. 202a.

[9]Margaret Gordon, a clinical dietitian for the Commonwealth of Pennsylvania, testified at her deposition that the following non-meat, non-dairy items from the master menu contained garlic

DeHart's proposed diet now appears to be that he be served extra portions of vegetables and grains on the master menu, consistent with the Avon diet, *but with the portions individually prepared to his dietary specifications.* Alternatively, he proposes that he receive extra daily servings of the alternative protein sources available at the Prison, but specially prepared without pungent vegetables and outside of their rotation on the master menu. Therefore, to the extent that *DeHart* II's discussion of the third and fourth *Turner* factors used the Avon diet as its comparison point, our prior ruling provides little guidance for our analysis.

The District Court held that DeHart's proposed diet would place a greater burden on the Prison than the dietary accommodations granted to Jewish and Muslim inmates. *See* Magis. Rep. & Rec. on Mot. for Summ. J., at R.R. 30a-36a. DeHart's diet would require individualized preparation of his meals, which is made more burdensome by the fact that the Prison's kitchen was set up only for bulk food preparation. *Id.* Additionally, it would require special ordering soy milk,

. . .

7. Now that the Commonwealth serves alternate protein sources such as tofu, peanut butter and beans, *if they were to give me servings of those items without pungent vegetables*, it would come far closer to satisfying my nutritional needs than they do now.

Aff. of Robert P. DeHart, at R.R. 256a-260a (emphasis added).

whole grain bread and extra servings of the few alternative protein sources DeHart would eat, all at extra cost to the Prison. *Id.* Secured food storage would be required in order to prevent theft of the specially ordered items. *Id.* The District Court noted that DeHart's proposed diet was not nutritionally adequate, and would require regular nutritional audits by a contract dietician, also at extra cost to the Prison.[11] *Id.* In contrast, the District Court found that the religious diets provided to Jewish and Muslim inmates did not require

---

[11]In *DeHart* II we directed the District Court to determine how and if the Pennsylvania Department of Corrections Food Services Administrative Directive requiring a registered dietician to verify that the master menu meets or exceeds the recommended daily nutritional allowances would apply to DeHart's proposed diet. 227 F.3d at 49 n.1. If the District Court found that DeHart's proposed diet fell short of the nutritional standards contained in the Administrative Directive, we indicated that the issue would remain under *Turner* whether the directive was reasonably related to a legitimate penological interest. *Id.* Neither party nor the District Court addressed this question on remand. However, we recognize the link between good health and a nutritionally adequate diet, and note that the prison has a significant interest in keeping prisoners healthy, given the costs of medical treatment and the difficulty in preventing the spread of illness between prisoners in close quarters.

special ordering of items not already available at the Prison or through the Prison's current vendors, nor did they require individualized preparation of meals. *Id.*

On appeal, DeHart argues that the cold kosher meals served to Jewish inmates and the Sahoora bags provided to Muslim inmates during Ramadan also require individualized preparation and the serving of items not appearing, or outside their rotation, on the master menu. He contends that there is no reason why granting his request would pose any greater burden on the Prison than other special diets because individualized preparation is required for all the therapeutic meals and religious diets. Additionally, he argues that his dietary request is no more likely to lead to an increase in requests for dietary accommodations than any of the other special diets served at the Prison.

DeHart's arguments overlook a crucial distinction. None of the other special diets served at the Prison require individualized preparation *and* reorganization of the way prison kitchens prepare food *and* are provided to accommodate an inmate's religious beliefs.[12] Other religious diets

involve supplementing or alternating regular prison meals with additional foods already available at the prison. However, providing a diet free of pungent vegetables would mandate that the prison alter the way it prepares meals. This problem is only heightened by DeHart's failure to put forward, in specific terms, a diet that would fit within his restrictions. While some of the therapeutic diets include specially prepared items and foods not included on the master menu,[13] the failure to provide medically necessary therapeutic diets puts the health of inmates at risk and could result in significant medical expenses.

With respect to the dietary accommodations provided to Jewish inmates, the cold kosher meals do not require special ordering of items not already available at the Prison. The kosher meals involve negligible preparation, as they are uncooked, and in the case of some fruits and vegetables, uncut as well. In fact, the diet DeHart requests bears a greater resemblance to the hot kosher meals we declined to require in *Johnson*. The Sahoora bags provided to Muslim inmates require some special preparation in order to prevent foods in the breakfast bags from spoiling overnight, and add the complication of being served outside of

[12]There are no inmates receiving the cold kosher diet at SCI-Greene, so we compare DeHart's request to the diet served to Jewish inmates at SCI-Pittsburgh. The record does not specify exactly how many Muslim inmates there are at SCI-Greene or in the Pennsylvania correctional system, but the record indicates that the number is considerable.

[13]For example, the therapeutic diets include items that do not appear on the master menu, such as pineapple and grapefruit juice, apricots, sugar free beverages, cold cuts, chicken pieces in broth, pineapple chunks, and applesauce. Aff. of Karen Avon, at R.R. 219a-232a.

normal mealtimes. However, these Sahoora bags do not require major changes to how the prison purchases, stores or prepares food, in contrast to the special preparation of single servings sought by DeHart.

With regard to the fourth *Turner* factor, the District Court found that there was no alternative that could fully accommodate DeHart's religious dietary restrictions while imposing only a minimal burden on the Prison. *See* Magis. Rep. & Rec. on Mot. For Summ. J., at R.R. 34a-36a. Simply providing double servings of vegetables and grains on the master menu, or daily servings of the available alternative protein sources, would not meet DeHart's needs because they include pungent vegetables, which he has repeatedly affirmed that he would not eat. *Id.* at R.R. 35a. Special ordering of soy milk, whole grain bread and extra servings of alternative protein sources is costly and burdensome, as is the individualized preparation of master menu items without pungent vegetables. *Id.* DeHart denies that his proposed diet poses any special burden, but we agree that the record supports the conclusion that his religious dietary restrictions cannot be met, by the menu he suggests or any obvious and easy alternative, with only a de minimis cost to the Prison.

In *DeHart* II we affirmed the District Court's conclusion that first *Turner* factor favored the Prison, and reversed its findings as to the second, third and fourth factors. On remand, the lower court determined that those factors also favored the Prison, a conclusion that we affirm

today. Although analysis under *Turner* is not a mere tabulation of factors, it is clear from the foregoing analysis that the Prison's denial of DeHart's request for a diet consistent with his Buddhist beliefs is reasonably related to the Prison's legitimate interest in efficient food provision.

## IV.

As we noted in *DeHart* II, the analysis of DeHart's Equal Protection claim incorporates much of the discussion of the third and fourth *Turner* factors. 227 F.3d at 61. In our earlier opinion, we directed the District Court to reconsider its grant of summary judgment for Appellees in light of our invalidation of the distinction drawn between religious commandments and positive expressions of belief. *Id.* We held that "the distinction drawn between orthodox and non-orthodox believers cannot justify the refusal of DeHart's request" in the absence of some nexus between this distinction and a legitimate penological concern. *Id.* On remand and in this appeal, the Appellees argue instead that DeHart is not similarly situated to any group for equal protection purposes because his request poses a greater burden than the dietary accommodations given to Jewish and Muslim inmates. DeHart argues that he is similarly situated to Jewish and Muslim inmates, and again contests the District Court's conclusion that his proposed diet is more burdensome. However, because we find that the burden imposed by DeHart's proposed diet exceeds the burden imposed by accommodating Muslim and Jewish inmates, we affirm the District Court's

grant of summary judgment for Appellees on DeHart's Equal Protection claim.[14]

## V.

Subsequent to our decision in *DeHart II*, DeHart amended his complaint to state a claim under the newly enacted Religious Land Use and Institutionalized Persons Act. Appellees filed a motion to dismiss the amended complaint on the ground that DeHart had not exhausted the prison administrative grievance process for his RLUIPA claim. The District Court accepted the Magistrate's Report and Recommendation to dismiss and DeHart now appeals.[15] We exercise plenary review over a district court's decision to grant a motion to dismiss, and to the extent that our review turns on the statutory construction of the exhaustion requirement in Section 1997e(a), our review is also plenary. *Spruill v. Gillis*, 372 F.3d 218, 226 (3d Cir. 2004) (citations omitted).

Section 1997(e)(a) provides that "[n]o action shall be brought with respect to prison conditions under Section 1983 . . . or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (1996). This stringent exhaustion requirement was established by the Prison Litigation Reform Act of 1995 ("PLRA"), replacing language that required prisoners to exhaust only those "plain, speedy, and effective remedies as are available." Civil Rights of Institutionalized Persons Act, Pub. L. No. 96-247, 94 Stat. 349, § 7(a) (1980), *amended by* Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321 at 66 (1996). The PLRA was enacted with a two-fold purpose: to limit the number of prison condition lawsuits then flooding the courts and to return control over prison policies and decision-making to local prison officials. *See Porter v. Nussle*, 534 U.S. 516, 524-25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

---

[14]As a result of our conclusion that DeHart is not similarly situated to any other group of inmates, there is no need to consider the *Turner* factors in addressing his Equal Protection claim.

[15]Although the District Court's order does not so specify, we conclude that the dismissal for failure to exhaust administrative remedies was with prejudice, and therefore final and appealable under 28 U.S.C. § 1291. Plaintiff has never argued that the dismissal should be without prejudice, but instead contends that exhaustion is not required. In essence, the lower court's ruling was an adjudication on the merits of his contention because it addressed the question of whether RLUIPA so altered the standard of review as to require re-exhaustion of claims grieved under RFRA. Plaintiff has elected to stand on his dismissed complaint, rather than attempt to exhaust his RLUIPA claim. As a result, the order is appealable. *See Deutsch v. United States*, 67 F.3d 1080, 1083 (3d Cir. 1995); *Borelli v City of Reading*, 532 F.3d 950, 951-52 (3d Cir. 1976).

12

This Court has repeatedly held that Section 1997e(a) makes exhaustion of prison administrative remedies mandatory, regardless of the efficacy of the grievance process. *See, e.g., Nyhuis v. Reno*, 204 F.3d 65, 67 (3d Cir. 2000) (holding that "the PLRA amended § 1997e(a) in such a way as to make exhaustion of all administrative remedies mandatory–whether or not they provide the inmate-plaintiff with the relief he says he desires"); *Booth v. Churner*, 206 F.3d 289 (3d Cir. 2000) (finding exhaustion mandatory in Eighth Amendment claim brought by prisoner under § 1983 even though plaintiff sought monetary damages), *aff'd* 532 U.S. 731 (2001). We held that an across-the-board, mandatory exhaustion requirement serves the underlying policies of the PLRA, including:

> (1) avoiding premature interruption of the administrative process and giving the agency a chance to discover and correct its own errors; (2) conserving scarce judicial resources, since the complaining party may be successful in vindicating his rights in the administrative process and the courts may never have to intervene; and (3) improving the efficacy of the administrative process.

*Nyhuis*, 204 F.3d at 75. Although we rejected a judicially-created futility exception to the exhaustion requirement in *Nyhuis*, 204 F.3d at 71, we have never held that a prisoner must exhaust his claims more than once.

Appellees argue that DeHart has not given the Prison an opportunity to address his claim under what they assert is a new substantive standard contained in RLUIPA, and as a result, the District Court's dismissal for failure to exhaust administrative remedies is proper. Appellees have never contended that DeHart did not exhaust all the available administrative remedies when the claim was brought under RLUIPA's predecessor, RFRA. In fact, DeHart's suit predates the PLRA, and therefore he is not required to exhaust all remedies under the PLRA's stringent standard. It is clear from the record that prior to filing suit, DeHart exhausted all the administrative remedies available to him in seeking a diet that comported with his religious beliefs. The issue is then whether RLUIPA and RFRA are sufficiently different as to justify requiring DeHart to present his claim for a second time to the prison grievance process. Because we disagree with Appellees' contention that RLUIPA enacted a new substantive standard of review for prisoner religious claims, we hold that DeHart has satisfied the exhaustion requirement of Section 1997e(a) and may proceed with his RLUIPA claim.

RFRA provided that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a) (1993). RFRA included an exception to its blanket rule: "Government may substantially burden a person's exercise of religion only if it demonstrates that

application of the burden to the person—(1) is in furtherance of a compelling governmental interest, and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

RFRA had been passed in response to the Supreme Court's decision in *Employment Division v. Smith*, in which the Court declined to apply strict scrutiny to a facially neutral, generally applicable law that incidentally burdened members of a particular religious group. 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). In doing so, the Court held that application of the compelling government interest test it set forth in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), would have created the "anomaly" of a "constitutional right to ignore neutral laws of general applicability." *City of Boerne*, 521 U.S. at 513 (citing *Smith*, 494 U.S. at 885). The Congressional findings accompanying RFRA specifically repudiated the Court's decision in *Smith*, *see* 42 U.S.C. § 2000bb(a)(4), with Congress stating that the purpose of RFRA was "to restore the compelling interest test as set forth in *Sherbert v. Verner* and *Wisconsin v. Yoder* and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b)(1) (citations omitted).

In *City of Boerne*, the Supreme Court overturned RFRA as it applied to the States. It held that Congress had exceeded the scope of its enforcement powers under Section 5 of the Fourteenth Amendment in enacting RFRA. The Court concluded that RFRA was an impermissible attempt to change substantive constitutional law rather than remedy constitutional violations, given the broad scope of the Act, its applicability to the States, and the lack of evidence of First Amendment violations on par with the type of widespread abuse as demonstrated in support of the Voting Rights Act of 1965. *City of Boerne*, 521 U.S. at 530, 532.

Following the decision in *City of Boerne*, Congress attempted to preserve RFRA's compelling governmental interest/least restrictive means test by recasting it in a form that could avoid the fatal constitutional problems of that statute. The result of this effort, RLUIPA, essentially reiterates the language of RFRA as it applies to institutionalized persons:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person–
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a) (2000). Congress was explicit in its intent to replicate in RLUIPA the substantive portions of RFRA. 146 Cong. Rec. E1563-01 (daily

ed. Sept. 22, 2000) (statement of Rep. Canady) ("[Section 2000cc-1(a)] applies the RFRA standard to protect the religious exercise of persons residing in or confined to institutions"); 146 Cong. Rec. S7774-01 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy) ("[RLUIPA] applies the standard of the Religious Freedom Restoration Act").

Contrary to the position of Appellees and the District Court, it cannot be argued that RLUIPA does not apply the same standard to prisoner free exercise claims as did RFRA. The statutory language is nearly identical, and statements by RLUIPA's sponsors in the Congressional Record indicate that the legislative intent was to reenact RFRA in constitutional form.[16] *See* 146 Cong. Rec. E1563-01; 146 Cong. Rec. S7774-01. RLUIPA makes two fundamental changes to RFRA.

---

[16]Appellees raised the question of RLUIPA's constitutionality before the District Court, but the issue was mooted by the District Court's holding that DeHart had not exhausted his RLUIPA claim. The United States of America joined this case as an intervenor to defend the constitutionality of RLUIPA before the District Court. The Supreme Court recently granted certiorari in a case raising this issue. *See Cutter v. Wilkinson*, 349 F.3d 257 (6th Cir. 2003) (holding that RLUIPA violates the Establishment Clause), *cert. granted*, 73 U.S.L.W. 3229 (U.S. Oct. 12, 2004) (No. 03-9877). The constitutionality of RLUIPA may be an issue on remand to the District Court.

First, it pares the scope of the legislation from RFRA's broad applicability down to only land use issues and claims by institutionalized persons. *Compare* 42 U.S.C § 2000bb-1 ("Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability . . ."), *with* 42 U.S.C. § 2000cc ("No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person . . ."), *and* 42 U.S.C. § 2000cc-1 ("No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . , even if the burden results from a rule of general applicability. . ."). Second, it shifts the source of Congress' power to pass the Act. While RFRA was styled as an expression of congressional authority under Section 5 of the Fourteenth Amendment, RLUIPA was enacted pursuant to Congress' powers under the Spending Clause, U.S. Const. art. I, § 8, cl. 1, and the Commerce Clause, U.S. Const. art. I, § 8, cl. 3. *See* 42 U.S.C. § 2000cc-1(b) ("This section applies in any case in which – (1) the substantial burden is imposed in a program or activity that receives Federal financial assistance; or (2) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes."). RLUIPA makes no change to the standard by which prisoners' free exercise claims are reviewed.

The District Court's reliance on *Wilson v. Moore*, No. 4:01CV158-RV, 2002 WL

950062 (N.D. Fla. Feb. 28, 2002), is in error. In *Wilson*, the Northern District of Florida dismissed several claims made by the plaintiff, an inmate in a Florida state correctional facility, on the ground that the plaintiff had not exhausted his claims under the new RLUIPA standard, even though the claims were filed before RLUIPA was enacted. The crucial difference between *Wilson* and the instant case is that DeHart exhausted his free exercise claim under RFRA, which applied the same standard as contained in RLUIPA, whereas in *Wilson*, the plaintiff's grievances were filed well *after RFRA was declared unconstitutional. See Wilson*, 2002 WL 950062, at *3-4 (noting that plaintiff filed grievances on July 10, Aug. 21, Aug. 22, Dec. 18, and Dec. 25, 2000). As a result, the prison reviewed the *Wilson* plaintiff's claim under the pre-RFRA standard employed in *Smith* and *O'Lone v. Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), which applied the *Turner* reasonableness test to prisoner free exercise claims. *Wilson*, 2002 WL 950062, at *5. The actual holding of *Wilson* is that RLUIPA substantively changed the standard of review from what it was before RFRA was passed and after RFRA was declared unconstitutional, and not, as the lower court and Appellees suggest, from the standard contained in RFRA itself.

DeHart is not required to re-exhaust his RLUIPA claim. He appropriately presented his grievance to the Prison under the identical standard before commencing the instant lawsuit in 1995. The Prison has had its opportunity to correct its own errors under the compelling interest/least restrictive alternative test of RFRA and RLUIPA. Forcing DeHart to present the same claim under the same standard as a prerequisite to judicial review of his RLUIPA claim is unnecessary and serves none of the purposes of the PLRA's exhaustion requirement.

## VI.

For the foregoing reasons, the judgment of the District Court with respect to DeHart's First and Fourteenth Amendment claims will be affirmed. The judgment of the District Court with respect to DeHart's claim under the Religious Land Use and Institutionalized Persons Act will be reversed and remanded for further proceedings consistent with this opinion.